63 F.3d 1468
 95 Cal. Daily Op. Serv. 6319, 95 Daily Journal
D.A.R. 10,779
UNITED STATES of America, Plaintiff-Appellee,
v.
Jose LOPEZ-FLORES; Jose Eduardo Hernandez; Jose
Perez-Garcia; and Jaime Ortiz-Mejia, Defendants-Appellants.
 Nos. 93-50206, 93-50208, 93-50211 and 93-50216.
 United States Court of Appeals,
Ninth Circuit.
 No. 93-50206 was Submitted on the Briefs on March 8, 1995
*
Nos. 93-50208/50211/50216 were Argued and Submitted on March
8, 1995.
Decided Aug. 10, 1995.
 
 David B. Shea, Ventura, CA, for defendant-appellant Lopez-Flores.
 Joseph T. Vodnoy, Los Angeles, CA, for defendant-appellant Hernandez.
 Errol H. Stambler, Los Angeles, CA, for defendant-appellant Perez-Garcia.
 Victor B. Kenton, Santa Monica, CA, for defendant-appellant Ortiz-Mejia.
 Samantha M. Phillips and Margo Thole, Asst. U.S. Attys., Los Angeles, CA, for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before: SCHROEDER and KLEINFELD, Circuit Judges, and KING,** District Judge.
 SCHROEDER, Circuit Judge:
 
 
 1
 Defendants Jose Lopez-Flores, Jose Eduardo Hernandez, Jose Perez-Garcia and Jaime Ortiz-Mejia appeal their convictions after jury trial for hostage taking, in violation of 18 U.S.C. Sec. 1203(a), and use of a firearm in a crime of violence, in violation of 18 U.S.C. Sec. 924(c). The appellants held captive an alien who had been smuggled illegally into the United States. They demanded an amount of money for his release that was substantially higher than the smuggling fee the alien had agreed to pay.
 
 
 2
 Appellants raise two principal issues on appeal. First, they argue that the Hostage Taking Act, 18 U.S.C. Sec. 1203, which criminalizes, inter alia, conduct that involves either a non-national perpetrator or non-national victim, violates the Equal Protection Clause by impermissibly classifying offenders and victims on the basis of alienage. Second, appellants argue that the Hostage Taking Act is inapplicable to a case involving alien smuggling.
 
 
 3
 The challenge to the constitutionality of the statute on equal protection grounds raises an issue of first impression in the federal courts. We conclude that the statute is constitutional as an exercise of Congress' plenary powers over aliens and foreign relations. The question of the applicability of the Hostage Taking Act to the type of conduct at issue in this case has previously been addressed by the Fifth Circuit in United States v. Carrion-Caliz, 944 F.2d 220 (5th Cir.1991), cert. denied, 503 U.S. 965, 112 S.Ct. 1573, 118 L.Ed.2d 217 (1992), and we follow its holding that the Act may be applied to alien smuggling conduct.
 
 
 4
 Several appellants additionally challenge the Act as void for vagueness, and each of the appellants challenges the sufficiency of the evidence. We affirm the convictions.
 
 I. BACKGROUND
 
 5
 In early June of 1992, an agent of the appellants and Amilcar Santos, a Mexican citizen, agreed Santos would be smuggled illegally into the United States at Tijuana in exchange for Santos' promised payment of approximately $250. Santos understood that the smugglers, known as "coyotes," would take him to his wife's residence in the United States, where she would pay the fee upon his delivery. After crossing the border, however, the coyotes reneged on several terms of the agreement. Instead of taking Santos to his wife's residence, the smugglers took him to a "drop house" in Los Angeles, California, where he was locked in a room with approximately 20 other smuggled persons. Additionally, the coyotes increased the smuggling fee from $250 to approximately $400.
 
 
 6
 Appellants were Santos' captors and guards. They fed him once a day and permitted him to leave the room only to use the bathroom. While Santos was detained at the drop house, he was subjected to beatings and threats at gunpoint. Appellant Perez-Garcia told Santos that he had attempted to contact Santos' wife. Santos was also told that he would not be released until his wife or friends paid the increased smuggling fee.
 
 
 7
 On June 5, 1992, approximately four days after his arrival, Santos escaped from the drop house by breaking and jumping through a kitchen window. Appellants Perez-Garcia, Lopez-Flores, and Ortiz-Mejia attempted to prevent Santos from escaping after Santos broke the window. Perez-Garcia grabbed and bit Santos' leg. Lopez-Flores held a loaded gun to Santos' head and told him to get back in the house. Santos grabbed the gun with both hands, and the gun fired, missing Santos. Santos managed to wrestle the gun away from Lopez-Flores and escaped from the drop house by falling out the window. After Santos' escape, Perez-Garcia and Lopez-Flores followed Santos by car and tried to coax him back to the house and to give up the gun. A bus driver picked up the bleeding Santos and drove him to a policeman. Later that day, Santos led the police to the drop house where Perez-Garcia and Ortiz-Mejia were arrested. Lopez-Flores and Hernandez were arrested several months later, on August 6, 1992.
 
 
 8
 On August 21, 1992, the first superseding indictment was filed against the four appellants. It charged all four with conspiring to transport, harbor, and detain illegal aliens in violation of 18 U.S.C. Sec. 371 (Count 1); seizing and detaining illegal aliens in order to compel the payment of ransom in violation of 18 U.S.C. Sec. 1203(a) (Counts 2 and 4); using a firearm during and in relation to a crime of violence (hostage taking) in violation of 18 U.S.C. Sec. 924(c) & (d) (Count 3); and harboring illegal aliens in violation of 8 U.S.C. Sec. 1324(a)(1)(C) (Count 6). Perez-Garcia additionally was charged with transporting illegal aliens in violation of 8 U.S.C. Sec. 1324(a)(1)(B) (Count 5). In September of 1992, the defendants filed motions to dismiss Counts 2 and 4 which charged them with hostage taking in violation of 18 U.S.C. Sec. 1203(a). On October 20, 1992, the district court denied the motions to dismiss.
 
 
 9
 Jury trial commenced mid-November, 1992. On December 2, 1992, the defendants moved for a judgment of acquittal on Counts 2 and 4, the hostage taking counts, pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The court denied the motion. On December 10, 1992, the jury found all four defendants guilty of conspiracy,[1] hostage taking, use of a firearm in a crime of violence, and illegal harboring, as charged in Counts 1, 2, 3 and 6 of the first superseding indictment. Perez-Garcia additionally was found guilty of illegal transportation as charged in Count 5 of the first superseding indictment. The jury found all four defendants not guilty of Count 4 of the indictment, which alleged a hostage taking of an illegal alien other than Santos.
 
 
 10
 Perez-Garcia and Ortiz-Mejia were each sentenced to 84 months in custody; Lopez-Flores and Hernandez received 111 and 130 months imprisonment, respectively. Each defendant's sentence reflects a mandatory 60 month sentence for the firearm conviction, 18 U.S.C. Sec. 924(c)(1), to be served consecutive to the concurrent sentences on the other counts of conviction. All four defendants filed timely notices of appeal from their judgments of conviction. They challenge only their hostage taking convictions and the firearms convictions, which the hostage taking convictions support.
 
 II. EQUAL PROTECTION CHALLENGE
 
 11
 The Hostage Taking Act, 18 U.S.C. Sec. 1203, provides in relevant part:
 
 
 12
 (a) [W]hoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or governmental organization to do or abstain from any act ... shall be punished by imprisonment by any term of years or for life.
 
 
 13
 ....
 
 
 14
 (b)(2) It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.
 
 
 15
 18 U.S.C. Sec. 1203 (emphasis added).
 
 
 16
 Section 1203 classifies offenders on the basis of the offender's and the victim's nationality. If either the alleged offender or the victim is a non-national, the Hostage Taking Act applies; however, if both the alleged offender and the victim(s) are nationals of the United States (and the offense occurred in the United States and each alleged offender is found in the United States) then the Act is inapplicable, unless the alleged offender sought to compel the government of the United States to do or abstain from any act. 18 U.S.C. Sec. 1203(a) & (b)(2). Appellants claim that the Hostage Taking Act, on its face, violates the Equal Protection Clause because, as modified by subsection (b)(2), it arbitrarily classifies offenders and victims on the basis of alienage.
 
 
 17
 The government argues as a threshold contention that the appellants lack standing to bring an equal protection challenge to the statute because, since the hostages were non-nationals, the appellants' alleged conduct would have violated the statute even if the appellants had been U.S. nationals. That the statute classifies victims on the basis of alienage is of no consequence, the government further contends, because the appellants cannot assert the equal protection rights of third-party victims. Appellants do not seek to assert the third-party rights of the hostage victims, nor do they challenge the Hostage Taking Act as it was applied to them; rather, their challenge is facial. They argue that the Act works an improper government classification that makes alienage a necessary element of almost every case prosecuted under the Act. Standing to bring a materially similar equal protection challenge was approved by the Supreme Court in McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). In McCleskey, a black defendant sentenced to death as a result of killing a white victim was found to have standing to claim he was discriminated against on the basis of the victim's race in violation of equal protection. The Court so held because the defendant did not seek to assert some right of the victim, but claimed that application of the state statute created a classification that was an arbitrary exercise of governmental power. Id. at 291-92 n. 8, 107 S.Ct. at 1766-67 n. 8. Because "[a] defendant in a criminal proceeding is entitled to insist that his conduct be judged in accordance with a rule that is constitutionally valid," United States v. Bozarov, 974 F.2d 1037, 1040 (9th Cir.1992) (internal quotations omitted), we conclude the appellants have standing. We turn to the merits of their challenge.
 
 
 18
 The Due Process Clause of the Fifth Amendment to the United States Constitution, which is applicable to the federal government, incorporates the Fourteenth Amendment's right to equal protection. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Analysis of an equal protection claim alleging an improper statutory classification involves two steps. Appellants must first show that the statute, either on its face or in the manner of its enforcement, results in members of a certain group being treated differently from other persons based on membership in that group. See Jones v. Helms, 452 U.S. 412, 423-24, 101 S.Ct. 2434, 2442-43, 69 L.Ed.2d 118 (1981); Hernandez v. Texas, 347 U.S. 475, 479, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954). This appellants have established. Second, if it is demonstrated that a cognizable class is treated differently, the court must analyze under the appropriate level of scrutiny whether the distinction made between the groups is justified. Plyler v. Doe, 457 U.S. 202, 217-18, 102 S.Ct. 2382, 2395-96, 72 L.Ed.2d 786 (1982).
 
 
 19
 The Hostage Taking Act, ratified by the Senate and signed by President Reagan in 1984, was enacted to implement the International Convention Against the Taking of Hostages, U.N. GAOR, Supp. No. 39, at 23, U.N.Doc. A/34/39 (1979) [hereinafter Hostage Taking Convention], to which the United States became a signatory in 1979. In the wake of a record number of terrorist attacks on American soil, President Reagan introduced a legislative package that included a bill which would become the Hostage Taking Act, intending to "send a strong and vigorous message to friend and foe alike that the United States will not tolerate terrorist activity against its citizens within its borders." See President's Message to the Congress Transmitting Proposed Legislation to Combat International Terrorism [hereinafter President's Message], Pub.Papers, Admin. of Ronald Reagan 575, 576 (April 26, 1984). Subsection (b)(2) of the Act, which exempts most purely domestic hostage takings from the Act's coverage, virtually mirrors Article 13 of the Hostage Taking Convention, which makes the Convention inapplicable to hostage takings lacking an international aspect.[2]
 
 
 20
 Appellants erroneously argue that we must apply strict scrutiny to the alienage classifications found in the Hostage Taking Act. They rely on cases involving state laws employing alienage classifications, while we deal with a federal statute. State alienage classifications create a "suspect class" to which we apply strict scrutiny. See Bernal v. Fainter, 467 U.S. 216, 219, 104 S.Ct. 2312, 2315, 81 L.Ed.2d 175 (1984) ("a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny"); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (state statutes that deny welfare benefits to resident aliens and aliens who have not resided in the United States for a specified number of years violate the Equal Protection Clause); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (state law excluding persons of Mexican descent from juries violative of Equal Protection Clause).
 
 
 21
 Federal laws that classify on the basis of alienage, however, receive less searching judicial review than do state laws that classify on that basis. Federal interests regarding aliens are significantly different than those of the states; immigration and foreign relations are paramount federal concerns. See Mathews v. Diaz, 426 U.S. 67, 84-85, 96 S.Ct. 1883, 1893-94, 48 L.Ed.2d 478 (1976) ("equal protection analysis ... involves significantly different considerations [when] it concerns the relationship between aliens and the States rather than between aliens and the Federal Government"); Nyquist v. Mauclet, 432 U.S. 1, 7 n. 8, 97 S.Ct. 2120, 2124 n. 8, 53 L.Ed.2d 63 (1977); Mow Sun Wong v. Campbell, 626 F.2d 739, 744 n. 10 (9th Cir.1980), cert. denied, 450 U.S. 959, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981). In the federal context, there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State. Hampton v. Mow Sun Wong, 426 U.S. 88, 101, 96 S.Ct. 1895, 1904, 48 L.Ed.2d 495 (1976). In such cases where federal interests predominate, judicial scrutiny of alienage classifications is relaxed to a "rational basis" standard. See Mathews v. Diaz, 426 U.S. 67, 83, 96 S.Ct. 1883, 1893, 48 L.Ed.2d 478 (1976); Sudomir v. McMahon, 767 F.2d 1456, 1464 (9th Cir.1985).
 
 
 22
 Most cases addressing the relaxed scrutiny due federal alienage classifications have involved Congressional action taken pursuant to its plenary power to regulate immigration and naturalization under Article I, Section 8, Clause 4 of the Constitution. See, e.g., Mathews v. Diaz, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952); Berroteran-Melendez v. INS, 955 F.2d 1251 (9th Cir.1992). Appellants attempt to distinguish their case because the Hostage Taking Act is not an exercise of the Immigration power. Yet the Act was prompted by considerations that are also uniquely federal. Strong foreign policy concerns arising from the increased threat of in-country terrorist attacks and the desire to meet the United States' obligations under international treaties provided the impetus for passage of the Hostage Taking Act. See President's Message, Pub.Papers, Admin. of Ronald Reagan 575 (April 26, 1984). Section 1203(b)(2)'s exclusion of purely domestic hostage taking cases (involving both U.S. national perpetrators and victims) is consistent with both the Hostage Taking Convention, which the Act implements, see n. 2, supra, and Congress' federalism-based respect for state and local authority in this area of law enforcement.[3]
 
 
 23
 The same principles that animate both the Constitution's grant of plenary control over immigration legislation to Congress and the attendant low level of judicial review of such legislation dictate a similarly low level of review here, where foreign policy interests are strongly implicated. As the Mathews Court noted,
 
 
 24
 [f]or reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.... Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution.
 
 
 25
 Mathews v. Diaz, 426 U.S. at 81, 96 S.Ct. at 1892 (emphasis added).
 
 
 26
 In a case decided the same day the Court issued its opinion in Mathews, the Court stressed that Congressional power over aliens is plenary in nature and subject to limited review. Hampton v. Mow Sun Wong, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976). Hampton involved a challenge to Civil Service Commission regulations that excluded all persons except American citizens and natives of Samoa from employment in most positions of federal service. The Court indicated that Congress' power over aliens with regard to immigration matters is a part of its general power, political in nature, over aliens:
 
 
 27
 It is important to note that the authority to control immigration is not only vested solely in the Federal Government, rather than the States, [citation omitted], but also that the power over aliens is of a political character and therefore subject only to narrow judicial review.
 
 
 28
 Hampton, 426 U.S. at 101 n. 21, 96 S.Ct. at 1905 n. 21 (emphasis added). See also Plyler v. Doe, 457 U.S. 202, 219 n. 19, 102 S.Ct. 2382, 2396 n. 19, 72 L.Ed.2d 786 (1982) ("With respect to the actions of the Federal Government, alienage classifications may be intimately related to the conduct of foreign policy...."); Harisiades v. Shaughnessy, 342 U.S. 580, 588-89, 72 S.Ct. 512, 518-19, 96 L.Ed. 586 (1952) ("It is pertinent to observe that any policy towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations.... Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.").
 
 
 29
 The case raising issues most similar to this case involved an equal protection challenge to the Fishery Conservation and Management Act of 1976 (FCMA), 16 U.S.C. Secs. 1801-82 (1976). United States v. Tsuda Maru, 479 F.Supp. 519 (D.Alaska 1979). The FCMA provided different rules for treatment of American vessels and non-American vessels in waters that extended beyond the territory of the United States. The court expressly recognized that distinguishing between citizens and non-citizens is essential to the conduct of foreign relations:
 
 
 30
 [T]he equal protection doctrine limiting alienage classifications does not apply to Congressional exercise of powers relating to foreign policy or immigration and naturalization. The doctrine simply makes no sense in that context because drawing distinctions between aliens and citizens is inherent to ... the conduct of foreign relations.
 
 
 31
 ....
 
 
 32
 The FCMA is not immigration legislation but it ... is directly related to international relations.... The Fifth Amendment equal protection doctrine does not prohibit the Congress from distinguishing between citizens and aliens in exercise of powers relating to foreign policy.... If the Congress could not draw such lines between citizens and non-citizens it is difficult to imagine how the country could conduct foreign relations.
 
 
 33
 Id. at 522-23 (emphasis added); accord United States v. Kaiyo Maru No. 53, 503 F.Supp. 1075, 1086 (D.Alaska 1980) (adopting Tsuda Maru equal protection holding), aff'd, 699 F.2d 989 (9th Cir.1983).
 
 
 34
 Federal legislation that classifies on the basis of alienage, enacted pursuant to Congress' immigration or foreign policy powers, is therefore subject to the lowest level of judicial review. Only classifications that "arbitrarily subject all resident aliens to different substantive rules from those applied to citizens" will fail to survive that scrutiny. Hampton, 426 U.S. at 101, 96 S.Ct. at 1905. As the Hampton Court explained:
 
 
 35
 [w]hen the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest.
 
 
 36
 Id. at 103, 96 S.Ct. at 1905. The alienage classifications contained in the Hostage Taking Act were clearly intended to serve Congress' legitimate foreign policy concerns.
 
 
 37
 Several appellants point to an episode that occurred during Senate consideration of an earlier, broader version of the Act that did not contain section 1203(b)(2)'s exemption for U.S. national offenders who take U.S. national victims.[4] Senator Leahy posed written questions to the United States Department of Justice which were recorded as part of the hearings before the Senate Subcommittee on Security and Terrorism. See Legislative Initiatives Hearings, 98th Cong., 2d Sess. 122-130 (1984). Question number 3 read: "If the [Hostage Taking] Convention does not require that federal jurisdiction be extended to [circumstances involving only U.S. national perpetrators and victims], why was it necessary to draft the bill so broadly as to cover these circumstances?" The Department of Justice responded, in pertinent part:
 
 
 38
 [I]f we chose to include the alienage of the victim or the perpetrator as an element of the offense, there would be serious questions of "equal protection of the laws" and also basic fairness. (For example, to take an alien hostage would be covered, but not to seize a fellow citizen; an alien who took an American hostage would commit a crime, while another American who took the same American hostage would not.)
 
 
 39
 Legislative Initiatives Hearings, 98th Cong., 2d Sess. 123-24 (1984).
 
 
 40
 Appellants contend this early Justice Department response should guide our interpretation of the statute. It does not. The Department of Justice prematurely and erroneously concluded that federal classifications on the basis of alienage in this context would raise equal protection problems. Its misstatement is neither authoritative nor persuasive in the face of controlling Supreme Court constitutional interpretations of congressional power in this field.
 
 
 41
 III. APPLICABILITY OF THE HOSTAGE TAKING ACT TO ALIEN SMUGGLING
 
 
 42
 Appellants argue that the facts of this case do not warrant application of 18 U.S.C. Sec. 1203 because the Hostage Taking Act was never intended to cover alien smuggling, and that the crimes of harboring and transporting illegal aliens are already adequately addressed in Title 8 of the U.S.Code. While the appellants correctly note that the specific facts of this case could have supported other charges under either state or federal law, the issue is whether the Hostage Taking Act sets forth elements that clearly encompass the conduct at issue in this case. We hold that it does.
 
 
 43
 Application of 18 U.S.C. Sec. 1203 to a similar case involving alien smuggling has been upheld by the only other circuit to have considered this issue. In United States v. Carrion-Caliz, 944 F.2d 220 (5th Cir.1991), cert. denied, 503 U.S. 965, 112 S.Ct. 1573, 118 L.Ed.2d 217 (1992), the defendant had helped Mexican citizens cross from Mexico into the United States and thereafter held them hostage to compel their relatives to make payments for their release. The government prosecuted the defendant under the Hostage Taking Act. The Fifth Circuit identified the essential elements of a hostage taking conviction and found them met by the facts of that case:
 
 
 44
 [B]y the plain terms of the statute, a conviction under the Hostage Taking Act requires the Government to show that the defendant 1) seized or detained another person, 2) threatened to kill, injure, or continue to detain that person, 3) with the purpose of compelling a third person or governmental entity to act in some way, or to refrain from acting in some way.
 
 
 45
 Id. at 223.
 
 
 46
 Although alien smuggling was not expressly considered in the Hostage Taking Act's legislative history, testimony during hearings acknowledged that Senate Bill 2624 would cover more than terrorist acts:
 
 
 47
 As defined, the term covers hostage-taking whether or not perpetrated by terrorists.
 
 
 48
 ....
 
 
 49
 Although the bill is not limited to hostage-taking by terrorists, in keeping with the purpose of the international Convention, we do not intend to assume jurisdiction where there is no compelling federal interest.
 
 
 50
 Legislative Initiatives Hearings, 98th Cong., 2nd Sess. 48-49 (1984) (statement of Victoria Toensing, Deputy Assistant Attorney General). Here the federal interests are very great. We join the Fifth Circuit in holding that the Hostage Taking Act can be applied to alien smugglers whose conduct involves holding aliens for ransom.
 
 
 51
 Appellants Lopez-Flores and Ortiz-Mejia also argue that the Hostage Taking Act is unconstitutionally vague and overbroad because the language of section 1203 is not sufficiently specific to notify an offender of when a "garden variety" alien smuggling case turns into a hostage taking case. The immigration laws targeting "garden variety" alien smuggling, however, do not involve nonconsensual detention. See 8 U.S.C. Sec. 1323 ("Unlawful bringing of aliens into United States"); 8 U.S.C. Sec. 1324 ("Bringing in and harboring certain aliens"). When an alien smuggler detains an alien against his will and in a manner intended to coerce the payment of money by a third party above the amount the victim had originally agreed to pay, the smuggler is no longer engaged in consensual smuggling. Section 1203 is sufficiently specific to provide the ordinary person notice of what conduct is prohibited and to provide government officials minimum guidelines for enforcement. See United States v. Van Hawkins, 899 F.2d 852, 854 (9th Cir.1990) ("statute must 'define the criminal offense with sufficient definitiveness that ordinary people can understand what conduct is prohibited' " and must " 'establish minimum guidelines to govern law enforcement' ") (quoting Kolender v. Lawson, 461 U.S. 352, 357-58, 103 S.Ct. 1855, 1858-59, 75 L.Ed.2d 903 (1983)).
 
 IV. SUFFICIENCY OF THE EVIDENCE
 
 52
 Appellants argue that the evidence at trial was not sufficient to sustain the verdict with regard to hostage taking. Because appellant Hernandez raises different issues than the other appellants, we discuss his argument separately. We review the sufficiency of the evidence to determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," United States v. Sharif, 817 F.2d 1375, 1377 (9th Cir.1987), and conclude that the evidence was sufficient to support each appellant's hostage taking conviction.
 
 
 53
 A. Appellants Lopez-Flores, Perez-Garcia and Ortiz-Mejia
 
 
 54
 In order to prove a violation of 18 U.S.C. Sec. 1203(a), the government must show that the defendant: (1) seized or detained another person; (2) threatened to kill, injure, or continue to detain that person; and (3) did so with the purpose of compelling a third person or governmental entity to act in some way, or to refrain from acting in some way. 18 U.S.C. Sec. 1203(a); see also Carrion-Caliz, 944 F.2d at 223.
 
 
 55
 Appellants argue that the evidence was insufficient to prove the third element, i.e., that the smuggling fee did not in fact become a ransom intended to compel a third person to do an act (make payment) as a condition for the release of Santos. In Carrion-Caliz, the Fifth Circuit considered a record similar to that in the instant case, and concluded that the third element of the statute was met:
 
 
 56
 Taken in the light most favorable to the Government, the evidence showed that when Carrion spoke to [the victim's sister], he told her that Luisa and her family were in his power, and that they would disappear if [she] did not pay him the money he demanded. Plainly, the jury could have found that he threatened to injure or to kill Luisa and the girls in order to compel [the sister] to pay him.
 
 
 57
 944 F.2d at 223.
 
 
 58
 Appellants attempt to distinguish Carrion-Caliz, arguing that here no demand was made to any other individual, nor was any "ransom" demand made upon a third party to compel Santos' release. This argument is contradicted by the record. Santos testified that appellant Perez-Garcia told him that he had attempted to call one of Santos' friends and that he had talked to the friend and told him to tell Santos' wife to deliver the money as soon as possible. Santos also testified that he had given his wife's telephone number to the recruiting coyote in Tijuana before he crossed and that appellant Perez-Garcia had attempted to call her to ask her to bring $400 for Santos' release.
 
 
 59
 Appellants' characterization of the smuggling fee as a "consensual payment" rather than a ransom demand also contradicts Santos' testimony. While it is true that Santos' testimony regarding the specifics of the increase in the smuggling fee was not completely consistent, we must assume that the jury resolved all credibility disputes in favor of the verdict. United States v. Robinson, 967 F.2d 287, 292 (9th Cir.1992). For purposes of the Hostage Taking Act, the amount added to the consensual fee constituted the ransom for Santos' release. That the smuggling fee Santos agreed to pay and his decision to cross the border with the coyotes were originally consensual does not change the nature of his detention and the ransom demand made in California. We agree with the Fifth Circuit's holding in Carrion-Caliz:
 
 
 60
 the Hostage Taking Act does not require that the seizure or detention of the hostage be against the hostage's will from its inception. That is, the fact that the hostage may initially agree to accompany the hostage taker does not prevent a later 'seizure' or 'detention' within the meaning of the Hostage Taking Act.
 
 
 61
 Carrion-Caliz, 944 F.2d at 226.
 
 
 62
 A rational jury considering all of the evidence against appellants Lopez-Flores, Perez-Garcia and Ortiz-Mejia could have found them guilty of hostage taking beyond a reasonable doubt. As all three elements of the offense were adequately established, the evidence was sufficient to support their hostage taking convictions.
 
 B. Appellant Hernandez
 
 63
 Hernandez argues that his conviction for hostage taking should be reversed because (1) he was not present on June 5, 1992, when Santos attempted to escape and (2) the jury returned a special finding of fact that the crime of hostage taking was not an object of the conspiracy with which he was charged. Hernandez contends that the evidence was therefore insufficient to find him guilty of hostage taking.
 
 
 64
 Hernandez's hostage taking conviction is supported by the evidence under an aiding and abetting theory of liability. A prosecutor need not charge a separate count for aiding and abetting because "[e]very indictment for a federal offense charges the defendant as a principal and as an aider and abettor." United States v. Canon, 993 F.2d 1439, 1442 (9th Cir.1993).[5] To convict a defendant of aiding and abetting, the government must prove that the defendant
 
 
 65
 willingly associated himself with a criminal venture and participated therein as something he wished to bring about.... An abettor's criminal intent may be inferred from the attendant facts and circumstances and need not be established by direct evidence.
 
 
 66
 United States v. Cloud, 872 F.2d 846, 850 (9th Cir.), cert. denied, 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989).
 
 
 67
 Hernandez points to the fact that he was "not present at the scene of the crime on June 5, 1992," the day Santos escaped. However, the crime of hostage taking took place throughout the several days Santos was detained at the drop house. Hernandez aided and abetted the hostage taking during that period: he guarded the aliens with a gun that was registered to him; he beat Santos with a gun because he feared that Santos was causing trouble with the other detainees by discussing the increased smuggling fee with them; and a vehicle that was registered to Hernandez was used to transport the smuggled aliens. A reasonable jury could have found Hernandez guilty of hostage taking beyond a reasonable doubt under an aiding and abetting theory of liability.
 
 
 68
 The district court's judgment is AFFIRMED.
 
 
 
 *
 The panel finds this case appropriate for submission without argument pursuant to Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4
 
 
 **
 The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 The jury made a special finding that the objects of the conspiracy in Count 1 were the crimes of transporting and harboring illegal aliens. The jury further found that the crime of hostage taking in violation of 18 U.S.C. Sec. 1203(a) was not an object of the conspiracy
 
 
 [2]
 Article 13 provides that "[t]his Convention shall not apply where the offense is committed within a single state, the hostage and the alleged offender are nationals of that State and the alleged offender is found in the territory of that State." Hostage Taking Convention, art. XIII, T.I.A.S. No. 11081
 
 
 [3]
 See Legislative Initiatives to Curb Domestic and International Terrorism: Hearings on S. 2470, S. 2624, S. 2625, S. 2626, before the Subcomm. on Security and Terrorism of the Senate Judic.Comm., 98th Cong., 2d Sess. 122-130 (1984) [hereinafter cited as Legislative Initiatives Hearings] (responses of the U.S. Department of Justice to Written Questions of Senator Leahy emphasizing the "continuing vitality of the state's primary responsibility for handling [internal] hostage-taking situations" and the Department's intent that S. 2624 "supplement[s] state law.... not supplant it.")
 
 
 [4]
 Under Senate Bill 2624, the legislation originally proposed to implement the Hostage Taking Convention, the United States would have had federal jurisdiction over any United States national who took hostages anywhere in the world and over any perpetrator, regardless of alienage, who took a United States national hostage anywhere in the world
 
 
 [5]
 Here, the court gave the jury an aiding and abetting instruction regarding the hostage taking count