In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3382 and 99-3391

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MISAEL MONTENEGRO and JUAN PEREZ,

Defendants-Appellants.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 399--Milton I. Shadur, Judge.


Argued September 20, 2000--Decided October 25, 2000


Before COFFEY, EASTERBROOK and EVANS, Circuit Judges.

COFFEY, Circuit Judge.  On July 7, 1998, a grand jury in the Northern District of Illinois returned a three-count indictment against Misael Montenegro, Juan Perez, and Jose Perez (Juan's brother)/1 charging the three men with two counts of violating the Hostage Taking Act, 18 U.S.C. sec. 1203,/2 and one count of conspiracy to commit those crimes, in violation of 18 U.S.C. sec. 371. After a jury found both defendants guilty of all three counts set forth in the indictment, the trial judge sentenced Montenegro to five years' imprisonment on the conspiracy count and 160 months' imprisonment on the Hostage Taking Act counts, all sentences to run concurrent with each other. The judge sentenced Juan Perez to five years' imprisonment on the conspiracy count and 200 months' imprisonment on the Hostage Taking counts, all sentences to run concurrently with each other. Each defendant also received three years' supervised release on the conspiracy count and five years' supervised release on the Hostage Taking counts, all to run concurrently with each other. Finally, both defendants received a $150 special assessment, and Montenegro was fined $4,000. On appeal, both defendants challenge their convictions, and Juan Perez argues that he was entitled to a reduction in his offense level, pursuant to U.S.S.G. sec. 3B1.2, for his "minor" role in the kidnapings. We affirm.

I.  BACKGROUND

Between 1989 and 1993, Montenegro fronted Jose Moreno one and a half kilos of cocaine with a value of $30,000. In 1994, Montenegro fronted Margarito Soto two kilos of cocaine with a value of $50,000. When Moreno and Soto failed to pay their debts in a timely fashion, Montenegro enlisted the assistance of Juan and Jose Perez to assist him in strong-arming the debtors into turning over the drug money owed to him.

The three men began their ill-advised, enforcer-like scheme on May, 11, 1995, when they drove to Moreno's residence and abducted Moreno from an alley behind his house where he was working on his car. According to Moreno's testimony at trial as well as statements made to investigators, when the three men arrived at Moreno's house, Jose Perez jumped out of the van, grabbed Moreno by his collar, and forced him into the van. Once Moreno was in the van, a fourth, unidentified occupant covered Moreno's eyes with a rag. After riding in the van for approximately twenty minutes, the van entered a garage where Moreno was blindfolded and beaten by his abductors. The beating left Moreno with cuts, bruises, and scrapes to his face and chest as well as a broken nose. Moreno was then led to another room and handcuffed to a cinder block wall. At this point, an object Moreno believed to be the barrel of a gun was jabbed into his chest and he was told by Jose Perez (Moreno recognized his voice) that he had to raise the money he owed Montenegro. Moreno responded by providing phone numbers to Jose Perez who, in turn, dialed the numbers on a cellular phone and allowed Moreno to attempt to raise the ransom money./3

That same night at approximately 9:30 p.m., Montenegro, Juan Perez, and Jose Perez drove to Soto's residence. When Soto answered the door, Montenegro asked him to step outside. After Soto exited the house, Montenegro placed his foot in front of the screen door to prevent Soto from reentering the house while Jose Perez approached Soto and threatened to kill him if he moved. When Soto claimed that he did not have the money to satisfy his outstanding debt, Montenegro and Jose Perez dragged him into the van, duct-taped his legs together, and taped his arms behind his back. According to Soto, he was then blindfolded and driven approximately twenty minutes to a big garage or warehouse. Soto was pulled out of the van and beaten with a hard object. Jose Perez then placed an object Soto believed to be a gun barrel on his forehead and asked "Do you want me to throw you into the river or just kill you now?" Soto was then dragged into another room where the duct tape was removed and he was

handcuffed to a ring on the wall. When the kidnappers left the room, Soto was able to remove his blindfold and saw that he and Moreno were in the same room with at least five other Hispanic men, all handcuffed to the wall./4 For three days Soto and Moreno attempted to raise money by contacting friends and family.

On May 13, 1995, at the direction of the FBI, Moreno's girlfriend informed the kidnappers that Moreno's ransom had been raised and a drop-off was arranged at a local Taco Bell restaurant with Moreno's uncle, Isauro Delgado, acting as the delivery man. The day the ransom money was to be delivered, Moreno was placed in a van with Juan and Jose Perez. The three men drove to the designated Taco Bell, but when Jose Perez noticed a significant amount of traffic in the area, he directed Moreno to contact his girlfriend and change the location of the ransom delivery. Moreno contacted Ayala, but was told that his uncle was already on his way to Taco Bell. After agreeing to continue with the original plan, Juan Perez parked the van at the Taco Bell and the three men waited inside the van until Moreno saw his cousin's car./5 Juan Perez then went into the restaurant, and after Jose Perez told Moreno, "[w]e're watching, so don't try anything stupid," Moreno got out of the van and walked to his cousin's car. FBI agents then surrounded the van where Jose Perez was waiting and arrested him and Juan Perez. After the police searched Juan and Jose Perez and the van they arrived in, they discovered handcuff keys on both of them as well as a replica of a handgun in the van./6

The next day, one of the kidnappers removed Soto's handcuffs and drove Soto to an alley where he was told to keep his blindfold on for five minutes after the kidnapper left or else Soto would be shot. After waiting several minutes, Soto removed his blindfold and contacted his wife who informed the FBI of his release.

II.  ISSUES

Both defendants now appeal their convictions, arguing that the trial judge committed plain error when he failed to question prospective jurors about any potential bias against aliens. The defendants also argue that the Hostage Taking Act is unconstitutional because it violates the Fifth Amendment in that it, according to the defendants, impermissibly discriminates against aliens. Finally, Perez raises a separate challenge and argues that the sentencing judge committed plain error when he failed to sentence Perez as a "minor" participant under U.S.S.G. sec. 3B1.2.

III.  DISCUSSION
A.  Voir Dire

   On appeal, both defendants argue that the trial
judge should have inquired during voir dire as to
the potential prejudice jurors might have as to
a person's foreign citizenship despite the fact
that trial counsel never requested that the judge
raise this potential bias issue with the venire.
Because the defendants failed to raise this claim
during trial, we review it for plain error.
United States v. Reynolds, 64 F.3d 292, 296 n.3
(7th Cir. 1995) (citing United States v. South,
28 F.3d 619, 625 (7th Cir. 1994)). As we stated
in United States v. Baker, No. 99-3840, 2000 WL
1347846 at *6 (7th Cir. Sept. 20, 2000),

[u]nder this standard, there must be: 1) an
error; 2) that is clear or obvious; and 3) that
affects substantial rights. United States v.
Olano, 507 U.S. 725, 732-35, 113 S. Ct. 1770, 123
L. Ed.2d 508 (1993); Cusimano, 148 F.3d at 828.
"In an effort to clarify when an error affects
substantial rights, the [Supreme] Court said 'in
most cases it means that the error must have been
prejudicial: It must have affected the outcome of
the District Court proceedings.'" Remsza, 77 F.3d
at 1044 (quoting Olano, 507 U.S. at 734). In this
circuit it is clear that "the constructive
amendment 'must constitute a mistake so serious
that but for it the defendant probably would have
been acquitted in order for us to reverse.'"
Hughes, 213 F.3d at 329 (quoting Cusimano, 148
F.3d at 828); see also Remsza, 77 F.3d at 1044.
Even then, "we have the power to correct the
error but are not required to do so." Cusimano,
148 F.3d at 828 (citing Olano, 507 U.S. at 735).
"We will not reverse unless we find the error
seriously affects the fairness, integrity, or
public reputation of judicial proceedings." Id.;
see also, Remsza, 77 F.3d at 1044.

   On appeal, the defendants argue that the trial
judge's failure to inquire into the jurors'
potential bias toward non-citizens of this
country violated their constitutional right to be
tried by an impartial jury because some of the
jurors may have had biases against resident
aliens./7 However, "[t]he conduct of voir dire
is left to the trial court's sound discretion,"
and "litigants do not have a right to have a
particular question asked." Gardner v. Barnett,
199 F.3d 915, 920-21 (7th Cir. 1999) (en banc)
(citing Ham v. South Carolina, 409 U.S. 524, 527
(1973)). Despite this broad discretion, there are
circumstances where trial courts are
constitutionally required, if the criminal
defendant so requests, to voir dire potential
jurors concerning racial or ethnic bias. Indeed,
"some cases may present circumstances in which an

impermissible threat to the fair trial guaranteed by due process is posed by a trial court's refusal to question prospective jurors specifically about racial prejudice during voir dire." Ristaino v. Ross, 424 U.S. 589, 595 (1976). Thus, when "special circumstances" reflect that racial issues are "inextricably bound up with the conduct of the trial," an accused's constitutional right to a trial by an impartial jury prohibits a trial court from refusing a request for voir dire directed to racial prejudice. Id. at 597.

The defendants essentially argue that if the trial judge is required to ask about race or ethnicity, then the judge should be required to inquire about citizenship. However, Ristaino only requires trial courts to engage in a voir dire concerning race or ethnicity if requested to do so by the defendant's trial counsel, and then only when race is, or might be, a central aspect of the case. Neither of the defendants-appellants has advised us of, nor have we found, any cases holding that a trial judge must question jurors sua sponte concerning racial or ethnic prejudice; presumably because there may be sound trial strategies for not wanting to focus the jurors' attention on the race or other aspect of the defendant. Furthermore, this court has recently held en banc that

[t]he conduct of voir dire is left to the trial court's sound discretion. Morgan v. Illinois, 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L. Ed.2d 492 (1992). The litigants do not have a right to have a particular question asked. Ham v. South Carolina, 409 U.S. 524, 527, 93 S. Ct. 848, 35 L. Ed.2d 46 (1973). Although the Constitution does require inquiries into certain biases (such as race), Ham, 409 U.S. at 527, 93 S. Ct. 848, bias against street gangs is not among them. Thus, Gardner had no entitlement to the questions he proposed.

Gardner, 199 F.3d at 920-21./8

Initially, defense counsel did not request that the judge direct any question to the jurors to determine if there existed any potential bias toward non-citizens of this country. Furthermore, judges, as the experienced trial judge did in this case, are well-advised not to raise such issues without a request from defense counsel lest the judge introduce questions (information) that defendants would rather not have the jurors' attention focused upon. We are convinced that the district judge did not commit error and that the voir dire was more than adequate.

B.   Constitutionality of the Hostage Taking Act

On appeal, the defendants also argue that the Hostage Taking Act violates the Fifth Amendment because "it discriminates against aliens by criminalizing actions by them (and their associates) which would not be illegal if everyone involved were American citizens." Specifically, the defendants claim that the Hostage Taking Act is unconstitutional because the Act "discriminates against aliens by using alienage as a proxy for terrorism."

"We apply the deferential rational basis test to federal statutes that classify based on alienage and will uphold the statute if it is rationally related to a legitimate government interest." United States v. Santos-Riviera, 183 F.3d 367, 373 (5th Cir. 1999) (citing Mathews v. Diaz, 426 U.S. 67, 79-87 (1976); United States v. Lue, 134 F.3d 79, 87 (2d Cir. 1998); United States v. Lopez-Flores, 63 F.3d 1468, 1475 (9th Cir. 1995)). Furthermore, the defendants do not attempt to distinguish the three cases from our sister circuits which hold that the Hostage Taking Act is constitutional. Santos-Riviera, 183 F.3d at 373-74; Lue, 134 F.3d at 81-87; Lopez-Flores, 63 F.3d at 1471-75.

In Lue, 134 F.3d at 87, the second circuit explained:

The classification drawn by the Hostage Taking Act covers all aliens involved in hostage-taking incidents. The asserted purpose of the statute, along with the antecedent Convention, is to address a matter of grave concern to the international community: hostage taking as a manifestation of international terrorism. See Hostage Taking Convention, preamble, T.I.A.S. No. 11,081. We recognize that in the Hostage Taking Act Congress employs the classification of alienage to proscribe conduct which may not always bear a direct relationship to the Act's principal object of stemming acts of terrorism, and that at some point a classification of this sort may have a "relationship to [the] asserted goal [which] is so attenuated as to render the distinction arbitrary or irrational." City of Cleburne, 473 U.S. at 446, 105 S. Ct. at 3258; see also United States v. Song, No. 95 Cr. 129, 1995 WL 736872, at *5 (S.D.N.Y. Dec. 13, 1995). However, in this instance, Congress rationally concluded that a hostage taking within our jurisdiction involving a noncitizen is sufficiently likely to involve matters implicating foreign policy or immigration concerns as to warrant a federal criminal proscription. The connection between the act and its purpose is not so attenuated as to fail to meet the rational-basis standard. See

Lopez-Flores, 63 F.3d at 1475; Song, 1995 WL 736872 at * 5; United States v. Pacheco, 902 F. Supp. 469, 472 (S.D.N.Y. 1995).

Like the Fifth Circuit, we adopt the reasoning and holding of Lue. Consequently, the defendants' attempt to put a new spin on an old argument has fallen upon deaf ears, and we uphold the convictions of both defendants as constitutional.

C. Minor Role

On appeal, Juan Perez also argues that the sentencing judge erred when he failed to reduce his sentence under U.S.S.G. sec. 3B1.2 because, according to Juan Perez, he played only a minor role in the scheme to kidnap Moreno and Soto. Initially, we note that Juan Perez failed to raise this claim at sentencing. Thus, we review his claim under the plain error standard. United States v. Soto, 48 F.3d 1415, 1421 (7th Cir. 1995). A plain error is one that is "particularly egregious," United States v. Frady, 456 U.S. 152, 163 (1982), and "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 736 (1993) (internal citation and quotation omitted). Furthermore, we have stated that the application of section 3B1.2 is heavily "dependent upon the particular facts of each case." United States v. Davis, 938 F.2d 744, 747 (7th Cir. 1991). "The controlling standard for an offense level reduction under [sec. 3B1.2] is whether the defendant was substantially less culpable than the conspiracy's other participants." United States v. DePriest, 6 F.3d 1201, 1214 (7th Cir. 1993).

In United States v. Kerr, 13 F.3d 203, 206 (7th Cir. 1993), we explained this standard and stated:

Whether one is a minor or minimal participant or a plain vanilla criminal is answered by the facts of the case and there is no formulaic solution. If everyone has an equal role, no one's offense level can be diminished, but the fact that one plays a much lesser role than another does not mean that one is a minor participant. The boss's trusted secretary through the years is crucial to the enterprise, even where the boss decides everything and gives all the orders. If the enterprise is criminal the secretary is a lesser participant but not a minor one.

When the facts of this case are considered, it is obvious that Juan Perez is not entitled to a reduction for being a minor participant.

Juan Perez admitted that, on May 11, 1997, he,

his brother, and Montenegro went to Moreno's home with the intent to use strong-arm tactics to collect the drug money owed to Montenegro and, if Moreno failed to come up with the money, to kidnap him and hold him for ransom. His claim that he was asleep while Moreno was dragged into the van and blindfolded is not only highly dubious (it is unlikely that one could or would sleep through a kidnaping), but also does nothing to mitigate his additional involvement in the kidnapings. According to Soto's testimony, during his abduction Jose Perez informed him that Juan Perez was in the van and wanted to talk to him. However, because Soto was blindfolded before he got into the van, he could not positively identify Juan Perez as one of his abductors. Despite Juan Perez's attempts on appeal to minimize his role in the kidnapings, a review of the record reveals additional steps Juan took to complete the kidnap-for-drug money scheme.

Not only did Juan Perez participate in the abduction of Moreno and Soto, but after the ransom drop had been arranged, Juan and Jose Perez drove Moreno to the Taco Bell for the exchange. Once they arrived, Juan turned to Moreno and said, "No hard feeling. It's business. This is the way we collect money." (Emphasis added). Finally, when Juan Perez was arrested in the Taco Bell, police recovered two sets of handcuff keys from him.

Given this information in the record, we are of the opinion that Juan Perez was not entitled to a reduction under section 3B1.2.

The defendants' convictions and sentences are AFFIRMED.

/1 Jose Perez is a fugitive and has yet to be tried for his involvement with these crimes.

/2 The Hostage Taking Act, 18 U.S.C. sec. 1203, provides:

(a) Except as provided in subsection (b) of this section, whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

(b)(1) It is not an offense under this section

if the conduct required for the offense occurred outside the United States unless--

(A) the offender or the person seized or detained is a national of the United States;

(B) the offender is found in the United States; or

(C) the governmental organization sought to be compelled is the Government of the United States.

(2) It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

(c) As used in this section, the term "national of the United States" has the meaning given such term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).

/3 One of the individuals Moreno contacted was his girlfriend, Brenda Ayala. When Ayala received the ransom demand, she immediately contacted the police, who in turn brought in the FBI.

/4 According to Moreno's statements to investigators, there were as many as ten other kidnaping victims, all of whom owed money to a drug supplier from an organization located in El Rodeo, Durango, Mexico.

/5 At this time, Juan Perez turned to Moreno and said, "[n]o hard feelings. It's business. This is the way we collect money."

/6 Jose Perez agreed to a search of the apartment that he and his brother, Juan, shared. The search resulted in the recovery of a .38 caliber handgun.

/7 The trial judge did inquire as to the jurors' potential bias based on: 1) Spanish speaking individuals (Montenegro needed a translator); 2) national origin; and 3) race--specifically Hispanic. Furthermore, the judge asked: "Are there any questions that I should have asked that bear on the ability of any of you to be a fair juror?"

/8 At oral argument, defense counsel, upon being questioned from the bench, was unable to give any meaningful reason as to why courts should treat alienage differently than race or gang affiliation.