**UNITED STATES of America**

v.

**Arturo PACHECO and Mario Alonso Quintero, Defendants.**

**No. 95 Cr. 431 (DC).**

United States District Court,
S.D. New York.

Oct. 31, 1995.

Lawrence K. Feitell, New York City, for Defendant Arturo Pacheco.

Ira D. London, New York City, for Defendant Mario Alonso Quintero.

Mary Jo White, United States Attorney for Southern District of New York by Patrick J. Smith, Assistant U.S. Attorney, New York City, for United States of America.

## MEMORANDUM DECISION

CHIN, District Judge.

Defendants Arturo Pacheco ("Pacheco") and Mario Alonso Quintero ("Quintero") have raised three issues in their pre-trial motions. First, defendants have moved to dismiss the indictment, claiming that the statute under which they were charged, the Hostage Tak-

ing Act, 18 U.S.C. § 1203 (the "Act"), violates the Equal Protection Clause either on its face or as applied. Second, defendants have moved pursuant to Fed.R.Evid. 404(b) to exclude evidence pertaining to a narcotics transaction. Third, defendants have moved for a bill of particulars. For the reasons discussed below, these motions are denied.

## BACKGROUND

Pacheco and Quintero are each charged with conspiracy to take a hostage and hostage taking in violation of 18 U.S.C. § 1203. According to the government, on or about February 2, 1995, DEA agents arrested Lauren Brito and charged him with selling 250 grams of heroin to a confidential informant. Subsequently, an individual contacted Brito and told him that he owed $16,000 for the heroin that the government seized at the time of his arrest. On March 21, 1995, four men abducted Carlos DeLeone, Brito's brother-in-law, in the vicinity of 183rd Street in Manhattan. The men took DeLeone to an apartment in Jackson Heights, New York, where Pacheco and Quintero were present. Brito was again contacted and told, in substance, that DeLeone had been abducted and would be harmed if Brito did not pay the money he owed for the heroin.

Later that day, Brito went to a location in Jackson Heights and paid Quintero approximately $2,000 in cash. DeLeone was then released. On March 22, 1995, Brito returned to Jackson Heights and paid Pacheco, in Quintero's presence, $5,000. Brito also turned over the title to his wife's vehicle. Importantly, neither Quintero nor DeLeone are nationals of the United States.

## DISCUSSION

### A. Motion to Dismiss Indictment

Defendants' primary contention is that the indictment should be dismissed because the Act is unconstitutional. Specifically, defendants claim that the Act violates the Equal Protection Clause because it irrationally sin-

gles out aliens for prosecution. Defendants also argue that the conduct charged is outside the scope of the Act and that the indictment's references to alienage are prejudicial.

### 1. Facial Challenge

A threshold requirement in bringing an equal protection claim based on a statutory classification is that the party alleging the violation must show that the statute, either on its face or as applied, results in members of a certain group being treated differently from other persons based on membership in that group. *Jones v. Helms,* 452 U.S. 412, 423–24, 101 S.Ct. 2434, 2442–43, 69 L.Ed.2d 118 (1981). Once that requirement is met, the court must analyze, under the appropriate level of scrutiny, whether the distinction is justified. *Plyler v. Doe,* 457 U.S. 202, 217–18, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982). Here, the Act treats aliens differently from United States citizens, as, in certain circumstances, particular conduct is criminal only if the perpetrator is an alien.[1] Thus, I must determine (1) the appropriate level of scrutiny and (2) whether the statute is proper under this level of scrutiny.

The Equal Protection Clause affords protection to aliens just as it does to citizens. *Graham v. Richardson,* 403 U.S. 365, 371, 91 S.Ct. 1848, 1851, 29 L.Ed.2d 534 (1971). Nonetheless, Congress may pass legislation containing distinctions based on alienage, so long as the distinctions are reasonable. *United States v. Duggan,* 743 F.2d 59, 75 (2d Cir.1984). In *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), the Supreme Court set forth the rationale for allowing Congress to draw such distinctions:

[t]he fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship.... For a host of constitutional and statutory provisions rest on the premise that a legiti-

---

1. Section (b)(2) of the Act provides as follows: It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nation- als of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

mate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other.... *Id.* at 78, 96 S.Ct. at 1890.

■ Thus, it is appropriate for Congress to regulate the conduct of aliens in ways that it cannot regulate the conduct of citizens because the conduct of aliens implicates foreign policy issues. Moreover, "since a wide variety of classifications must be defined in light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary." *Id.* at 81, 96 S.Ct. at 1892. For these reasons, courts have generally reviewed federal enactments that contain alienage-based classifications under a minimal level of scrutiny, *i.e.,* whether there exists a rational basis for the classification. *United States v. Lopez–Flores,* 63 F.3d 1468, 1473 (9th Cir.1995); *Duggan,* 743 F.2d at 76; *see also Hampton v. Mow Sun Wong,* 426 U.S. 88, 101 n. 21, 96 S.Ct. 1895, 1904 n. 21, 48 L.Ed.2d 495 (1976) (congressional power over aliens is political in nature and thus is subject to limited review).

The legislative history shows that the Act was passed to address legitimate foreign policy concerns. In 1979, the United States became a signatory to the International Convention Against the Taking of Hostages (the "Hostage Taking Convention"). Subsequently, a rash of terrorist attacks occurred, prompting President Reagan to introduce a legislative package that would "send a strong and vigorous message to friend and foe alike that the United States will not tolerate terrorist activity against its citizens within its borders." President's Message to the Congress Transmitting Proposed Legislation to Combat International Terrorism, Pub. Papers, Admin. of Ronald Reagan 575, 576 (Apr. 26, 1984). This proposed legislation evolved into the Act, which was ratified and signed by President Reagan in 1984.

The language of the Act is derived from the Hostage Taking Convention. In fact, the provision containing the alienage-based classification in the Act mimics language contained in the Hostage Taking Convention. *Compare* 18 U.S.C. § 1203(b)(2) *with* Hostage Taking Convention, Art. XIII, T.I.A.S. No. 11081. This history makes clear that the Act derived from an exercise of congressional power in the area of foreign relations.

Because the legislation in question is subject to the lowest level of judicial review, to uphold the statute I need only find that there is some rational basis to support the alienage classification. Plainly, such a rational basis exists. Congress has made a determination that, in dealing with the problem of international terrorism, aliens who engage in kidnapping or hostage taking ought to be prosecuted in federal court under a federal statute. I cannot say that that determination is irrational. Indeed, I find that the different treatment accorded aliens under the Act is rationally related to the Act's purpose of complying with this nation's foreign policy obligations under the Hostage Taking Convention and Congress's general responsibility in making foreign policy decisions.

### 2. *As Applied Challenge*

■ Defendants further argue that the indictment should be dismissed because the Act may only be applied to politically motivated abductions that have some international nexus, and that it should not be applied to what they suggest is a garden variety kidnapping. This claim must fail, however, because the crime charged falls within the plain language of the statute and because a rational basis exists for applying the Act to such a crime.

Defendants are charged, in substance, with detaining another person to compel a third person to do an act, namely pay ransom. Also, one of the defendants is not a national of the United States. These alleged facts fall within the ambit of the Act. It is true that this alleged crime is not directly related to international terrorism, which was the impetus in passing the Act. In fact, this alleged crime does not have any international aspect, other than the fact that one of the defendants is an alien. Nevertheless, the indictment should not be dismissed.

First, several courts have held that a broadly worded statute may be enforced according to its exact terms, regardless of Con-

gress's primary concern in enacting the legislation. *See, e.g., H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 248–49, 109 S.Ct. 2893, 2904–05, 106 L.Ed.2d 195 (1989) (Although its primary concern was to combat organized crime, "Congress drafted RICO broadly enough to encompass a wide range of criminal activity ... It would be counterproductive and a mismeasure of congressional intent now to adopt a narrow construction of the statute's pattern element that would require proof of an organized crime nexus."); *United States v. Bufalino,* 576 F.2d 446, 452 (2d Cir.) (defendant's charge upheld because it fell within the plain language of statute even though "a classic loan-sharking operation [is] the specific evil against which Congress interposed 18 U.S.C. § 894"), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978). Here, the crime charged falls within the plain words of the Act.

Second, a rational basis exists for applying the Act in this situation. Congress enacted the Act in response to a series of international terrorist incidents. Nevertheless, Congress did not limit the Act's scope to hostage taking in furtherance of such international terrorist activity. Rather, in drafting the Act as broadly as it did, Congress necessarily determined that any crime involving aliens is sufficiently "international" in nature to fall within the auspices of its power to legislate in the areas of foreign relations and immigration. Again, that determination is rational, as prosecution of the defendants under the Act is rationally related to Congress's foreign policy goals and obligations.

Third, application of the Act in this situation serves the general principle of deterrence and thus furthers Congress's goal of controlling terrorism and hostage taking. By applying the Act strictly, non-United States nationals will be put on notice that they will be prosecuted in federal court if they cross our borders and engage in acts of kidnapping. Thus, application of the Act in this case is rationally related to the Act's purpose of deterring non-United States na-

tionals from engaging in criminal conduct within the United States.[2]

I note that the court in *United States v. Carrion–Caliz,* 944 F.2d 220 (5th Cir.1991), appears to reach a different conclusion. There, the court stated that "the Hostage Taking Act applies *only* to acts of kidnapping or hostage taking which have some international aspect or involve the United States government. If the act of kidnapping or hostage taking at issue does not involve the United States government, and has no international aspect, then the Act does not apply." *Id.* at 224. A careful review of the context in which this statement was made, however, reveals that it does not conflict with my holding. The Fifth Circuit was merely drawing a distinction between the Act and the federal kidnapping statute, the latter of which has no reference to aliens or other international aspects. Moreover, it appears that the term "international aspect" was merely a short hand means of summarizing the Act's requirement that the offender or the person seized or detained is not a national of the United States. In other words, the "international aspect" that the court referred to is simply the fact that either a defendant or the victim is not a United States citizen.

Simply put, the Act sets forth elements that clearly encompass the conduct at issue in this case and a rational basis exists for applying the Act in this case. Accordingly, the indictment is properly brought under the Act.

### 3. *Language of Indictment*

 Defendants' final claim regarding the Act is that the indictment is prejudicial in that the use of the phrase "at least one of whom is not a national of the United States" is prejudicial and thus warrants dismissal of the indictment. As the government rightfully notes, the remedy for such a flaw is simply to strike the surplusage from the indictment. Fed.R.Crim.P. 7(d). Moreover, such a remedy is not called for in this case. The language used is relevant, as it is required to

---

**2.** It is also worth noting that the victim was a non-national as well. Although this fact is not charged in the indictment, it lends additional support to the application of the Act in this case,

as the government has a legitimate interest in protecting aliens who are the victims of hostage takings in our country.

satisfy the jurisdictional requirements of the statute. Thus, defendants' claim is rejected.

Accordingly, defendants' motion to dismiss the indictment is denied.

### B. *Motion to Exclude Uncharged Conduct*

■ Defendants seek to exclude evidence related to the narcotics transaction underlying the kidnapping charges in the indictment, arguing that the drug conspiracy has no bearing on any material issue, including motive, and that the prejudicial effect of such evidence outweighs its probative value.

The government counters that evidence of the drug conspiracy is admissible under two theories: (1) it is relevant background evidence; and (2) it is evidence of motive.

■ It is well settled that "[a] trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment." *United States v. Birbal,* 62 F.3d 456, 464 (2d Cir. 1995); *see also United States v. Skowronski,* 968 F.2d 242, 246 (2d Cir.1992) (same); *United States v. Towne,* 870 F.2d 880, 886 (2d Cir.) (evidence of acts that arose out of the same transaction or series of transactions as the charged offense is admissible to complete the story of the crime charged), *cert. denied,* 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989).

■ Similarly, it is generally proper to admit evidence that proves motive to commit a crime. *United States v. Willoughby,* 860 F.2d 15, 24 (2d Cir.1988); *United States v. Pedroza,* 750 F.2d 187, 200 (2d Cir.1984). In *Pedroza,* the Second Circuit held that it was proper to admit evidence relating to a cocaine transaction as proof of motive for the kidnapping charge alleged in the indictment. 750 F.2d at 200–01. The court also upheld the trial court's finding that the probative value of such evidence outweighed its prejudicial effect. *Id.* Similarly, in the present case, I find that evidence of the underlying narcotics conspiracy is necessary if the jury is to have any understanding of what this case is about and why the kidnapping occurred. Such probative value outweighs any prejudice that defendants may suffer simply because the evidence relates to drug activity. Accordingly, evidence of the underlying narcotics conspiracy is admissible.[3]

### C. *Request for a Bill of Particulars*

■ Defendants request a bill of particulars providing the following information:

1. the date, time and place of each act in furtherance of the narcotics conspiracy which the government intends to introduce at trial;

2. the identities of the persons who participated in the acts described in question one; and

3. the role that defendants held in relation to each act made in furtherance of the uncharged narcotics conspiracy.

■ The function of a bill of particulars is to provide defendant with information about the details of the charge against him if this is necessary to the preparation of his defense at trial. *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Id. (quoting United States v. Feola,* 651 F.Supp. 1068, 1132 (S.D.N.Y.1987); *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989)). The court must also determine whether the information sought has been provided elsewhere, such as through discovery, prior proceedings, or the indictment itself. *United States v. Strawberry,* 892 F.Supp. 519, 526 (S.D.N.Y.1995).

■ Here, defendant's request for a bill of particulars is meritless. In general, the government is not required to prove how or when the conspiracy was formed or how or when defendants joined the conspiracy. *United States v. Matos–Peralta,* 691 F.Supp. 780, 791 (S.D.N.Y.1988). Accordingly, requests for particulars on information such as

---

3. I note, however, that the government will not be permitted to offer cumulative evidence of the drug conspiracy. To the extent that the information on the fourteen tapes is repetitive, it will be excluded.

that sought by defendants are routinely denied. *Id.* Moreover, the charges are adequately set forth in the indictment, the criminal complaint, and in discovery provided to defendants. Notably, the government has produced audiotapes, which apparently include conversations between a confidential informant and a co-conspirator of the defendants. It appears that this discovery provides additional details of the underlying narcotics conspiracy.

Accordingly, because the government has adequately particularized the charges against defendants, defendants' motion for a bill of particulars is denied.

### CONCLUSION

For the reasons set forth above, defendants' motions are denied.

SO ORDERED.