**UNITED STATES of America,**

v.

**Chen De YIAN and Wang Kun Lue, Defendants.**

**No. 94 Cr. 719 (DLC).**

United States District Court, S.D. New York.

Nov. 1, 1995.

Andrew Schapiro, Federal Defenders Services Unit, Legal Aid Society, New York City, for defendant.

Tai Park, Assistant United States Attorney, Mary Jo White, United States Attorney, Criminal Division, New York City, for U.S.

## OPINION

COTE, District Judge:

In this motion to dismiss Counts Three, Four, Five, and Six of the Superseding Indictment, defendants Chen De Yian and Wang Kun Lue [1] challenge the constitutionality of 18 U.S.C.A. § 1203 (West Supp.1995) (hereinafter the "Hostage Taking Act" or

---

1. By letter dated May 4, 1995, counsel for defendant Wang joined in defendant Chen's supplemental motion to dismiss.

"Act") and 18 U.S.C.A. § 924(c) (West Supp. 1995). The Court assumes familiarity with the facts underlying all of the Counts at issue in this motion, which were recited in the Court's June 19, 1995 Opinion. *See United States v. Yian,* 1995 WL 368445 (S.D.N.Y. June 19, 1995). For the reasons set forth below, the motion to dismiss is denied.

In the wake of the Supreme Court's April 26, 1995 decision in *United States v. Lopez,* — U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), defendant Chen challenged the constitutionality of Section 1203 and Section 924(c), claiming that Congress lacked power to enact both statutes under the Commerce Clause,[2] and, additionally, that Section 1203's alienage classification violates the Equal Protection component of the Fifth Amendment's Due Process Clause.[3] *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). On June 16, 1995 the Court requested further briefing on three additional issues: First, whether Congress had power under the Necessary and Proper Clause[4] to implement the International Convention Against the Taking of Hostages, T.I.A.S. No. 11081 ("Convention") by enacting Section 1203. Second, whether Congress had power to enact Section 1203 under the Offenses Clause.[5] Third, whether Congress' power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, rendered Section 1203's alienage classification constitutional. Because Congress had the power to implement the Convention pursuant to the Necessary and Proper Clause, the Court does not decide whether other bases of legislative power exist to uphold the Hostage Taking Act.

## THE HOSTAGE TAKING ACT

The Hostage Taking Act was part of a three bill package enacted by Congress in 1984 aimed at combatting the rise of terrorism.[6] The Act implemented the Convention, which the United States and forty-five other countries signed on December 21, 1979, and by this legislation, Congress gave the United States' international obligations under the Convention the force of domestic law.[7]

The Hostage Taking Act provides in relevant part:

(a) Except as provided in subsection (b) of this section, whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts to do so, shall be punished by imprisonment....

(b)(1) It is not an offense under this section if the conduct required for the offense occurred outside the United States unless—

(A) the offender or the person seized or detained is a national of the United States;

(B) the offender is found in the United States; or

---

2. "The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

3. "No person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

4. "The Congress shall have Power ... To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18.

5. "The Congress shall have Power ... To define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." U.S. Const. art. I, § 8, cl. 10.

6. The two other bills were enacted as the Act to Combat International Terrorism, 18 U.S.C. § 3071 (1984), and the Destruction of Aircraft Act, 18 U.S.C. § 32 (1984).

7. In point of fact, Congressional implementation of the Convention was a condition precedent to depositing the instrument of ratification with the United Nations, by which act the United States would assume its international obligations pursuant to the Convention. *See* Message from the President of the United States Transmitting Four Drafts of Proposed Legislation to Attack the Pressing and Urgent Problem of International Terrorism, House Doc. 98–211, 98th Cong., 2d Sess., at 1 (Apr. 26, 1984); Convention art. 17.

(C) the governmental organization sought to be compelled is the Government of the United States.

(2) It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

18 U.S.C.A. § 1203 (West Supp.1995). The provisions of Section 1203 track the Convention's definition of the offense of hostage taking, including the exclusion of domestic hostage taking when the hostage and the offender are both nationals of the country in which the offense occurs.[8]

Defendants argue that the Hostage Taking Act is not essential to the implementation of the Convention: in other words, that Congress' exercise of its powers under the Necessary and Proper Clause is invalid. Alternatively, and presumably based on the Tenth Amendment,[9] defendants argue that the Act has "open[ed] a gaping hole in the carefully-designed balance of delegated powers that constitutes the federal system." Finally, defendants argue that the Hostage Taking Act violates the Equal Protection guarantee of the Fifth Amendment's Due Process Clause, U.S. Const. amend. V; see Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The Court is not persuaded by any of these challenges to the Act's constitutionality.

*Necessary and Proper Clause*

■■■ That Congress has authority to implement treaties, such as the Convention, pursuant to its power under the Necessary and Proper Clause of the Constitution is undisputed. If the treaty itself does not create legally enforceable, domestic obli-

gations (*i.e.*, if it is not "self-executing"), then Congress has the power to pass such legislation as is necessary and proper to implement the treaty. *See Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888); *Missouri v. Holland*, 252 U.S. 416, 432, 40 S.Ct. 382, 383, 64 L.Ed. 641 (1920) (Holmes, J.) ("If the treaty is valid there can be no dispute about the validity of the statute under Article 1, Section 8, as a necessary and proper means to execute the powers of the Government."). It is also well established that neither treaties nor laws passed pursuant to them are "free from the restraints of the Constitution," *Reid v. Covert*, 354 U.S. 1, 16, 77 S.Ct. 1222, 1230, 1 L.Ed.2d 1148 (1957), such as the Bill of Rights.

■■■ The first issue then is whether Congress had power under the Necessary and Proper Clause to pass the Hostage Taking Act. Defendants argue that, because the Convention was narrowly targeted at terrorism, the Convention did not *require* passage of the broadly worded Hostage Taking Act. There are several problems with this argument. First, the appropriate judicial standard for reviewing the Act is not strict scrutiny, but, rather, rational basis review. Consequently, so long as the Act bears some reasonable relationship to a grant of power to the national government, and it is not otherwise prohibited by the Constitution, the Court must find the law to be "necessary and proper." *See M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819) ("Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.").

Second, the Convention's purpose is not to fight "terrorism" in general but to address a discrete type of offense associated with terrorist activities.[10] Most importantly, Article

---

8. Relevant portions of the Convention appear in the Appendix, *infra*.

9. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

10. Defendants cite a passage from the Convention's Preamble in support of their interpretation. The Preamble states in relevant part as follows:

1 of the Convention, which defines the act of hostage taking, makes no reference to terrorism. Even the most cursory review of the subsequent Articles makes it clear that hostage taking—not "terrorism"—is the principal subject offense of the Convention.[11] If the Convention was narrowly targeted at terrorism, this is not evident on the face of the Convention.

Nor does the legislative history of the Hostage Taking Act indicate that the Act was intended to apply only to incidents of hostage taking associated with international or political terrorism.[12] The original versions of the bills in both the House of Representatives and the Senate did not have the equivalent of Section 1203(b)(2) and, therefore, contemplated federal jurisdiction over purely "internal" or "domestic" instances of hostage taking.[13] And in response to questions by Senator Leahy, the Department of Justice further explained that such instances of "internal"

> The States Parties to this Convention, ...
>
> . . . . .
>
> Considering that the taking of hostages is an offence of grave concern to the international community and that, in accordance with the provisions of this Convention, any person committing an act of hostage taking shall either be prosecuted or extradited,
>
> Being convinced that it is urgently necessary to develop international cooperation between States in devising and adopting effective measures for the prevention, prosecution and punishment of all acts of taking of hostages as manifestations of international terrorism, ...

It is worth noting that, although one passage from the Preamble makes reference to terrorism, it is couched in precatory language, unlike the passage that refers solely to hostage taking.

**11.** See, e.g., Articles 2 ("Each State Party shall make the offences set forth in article 1 punishable...."), 4 ("States Parties shall co-operate in the prevention of the offences set forth in article 1...."), 5 ("Each State Party shall take such measures as may be necessary to establish its jurisdiction over any of the offences set forth in article 1...."); see also Articles 8(2), 9(1)(a), 10, 11 (all referring to the offense of hostage taking as defined in Article 1).

**12.** Of course, because the Act's provisions are clear and unambiguous, see United States v. Lin, 881 F.Supp. 34, 36 (D.D.C.1995); United States v. Yunis, 681 F.Supp. 896, 904 (D.D.C.1988), it is unnecessary to examine the legislative history. See Haitian Centers Council, Inc., v. McNary, 969 F.2d 1350, 1358 (2d Cir.1992) (when "the words

hostage taking should not be limited to solely "terrorist" situations, because

> it would be necessary to define terrorism. The definition would most likely include some language such as "violent crime committed for political or ideological purposes." This would raise serious First Amendment questions.... By not including any element of "terrorism" in the offense, the statute is neutral on its face and avoids such constitutional issues.

Legislative Initiatives Hearings, 98th Cong., 2d Sess. 124. (1984).

In sum, the Convention's specific object was to focus international attention and to muster international cooperation around a discrete activity associated with terrorism: hostage taking.[14] The plain language of the Convention itself covers the conduct for which the defendants are being prosecuted, and, as noted before, the Convention no-

of the statute are unambiguous, 'judicial inquiry is complete' ") (quoting Connecticut National Bank v. Germain, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992)).

**13.** For example, Senate Bill 2624 read:

> (e) ... if a threat is made to kill, injure, or to continue to detain the victim in order to compel a third party to do or abstain from doing any act as an explicit or implicit condition for the release of the victim, the United States may exercise jurisdiction over the offense if the offense was committed within the United States; the alleged offender is a national of the United States; the victim or purported victim was a national of the United States; or the offender is present within the United States, irrespective of the place where the offense was committed or the nationality of the victim or the alleged offender.

S. 2624, 98th Cong., 2d Sess. (1984).

**14.** In this vein, it is worth noting that the Convention, as well as other treaties, such as the Hague Convention for the Suppression of Unlawful Seizure of Aircraft, 22 U.S.T. 1641 (1971) and the Montreal Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, 24 U.S.T. 564 (1973), are examples of what international law scholars have called the "piecemeal approach," see, e.g., Richard B. Lillich, Model American Convention of the Prevention and Punishment of Serious Forms of Violence, 77 Am.J.Int'l L. 662, 663 (1983), which avoids the political mine field of defining "terrorism."

where defines "terrorism" or applies political criteria to its definition of hostage taking.[15]

The Court concludes that the Hostage Taking Act is reasonably related to "carrying into Execution the ... Powers vested by this Constitution in the Government of the United States," U.S. Const. art. 1, § 8, cl. 18, namely, the Treaty Power, U.S. Const. art. II, § 2, cl. 2. A comparison of the Convention and the Act demonstrates that Congress' enactment of the Hostage Taking Act reasonably implements the Convention. Section 1203(a), which defines the crime of hostage taking, tracks the language of Article 1 of the Convention in every significant respect. Likewise, Section 1203(b)(1) comports with Article 5(1)(a), (b), and (d) of the Convention. Finally, Section 1203(b)(2) conforms with Article 13 of the Convention.[16]

*Federalism*

▪ Defendants' second objection to the Act's constitutionality apparently rests on Tenth Amendment grounds. The gravamen of this argument is that Congress' power to implement treaties is limited to matters of national or international importance. Defendants rely for this argument on *dictum* from Justice Holmes's opinion in *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920):

> It is obvious that there may be matters of the sharpest exigency for the *national well being* that an act of Congress could not deal with but that a treaty followed by such an act could, and it is not lightly to be assumed that, in matters requiring national action, 'a power which must belong to

and somewhere reside in every civilized government' is not to be found.

*Id.* at 433, 40 S.Ct. at 383 (emphasis supplied) (quoting *Andrews v. Andrews*, 188 U.S. 14, 33, 23 S.Ct. 237, 240–41, 47 L.Ed. 366 (1903)). In *Holland*, however, Justice Holmes rejected the proposition that the federal government lacked the power to sign and implement the treaty in question. Nowhere did the *Holland* Court imply that the federal government's treaty power was limited only "to subjects uniquely national (or international) in nature." To the contrary, in *Holland* the Court recognized that "the great body of private relations usually fall within the control of the State, but a treaty may override its power." *Holland*, 252 U.S. at 434, 40 S.Ct. at 384. The Court then cited cases in which matters as local as rights concerning land ownership or inheritance were appropriate subjects of the treaty power. *See id.* at 435, 40 S.Ct. at 384 (citing, *inter alia, Hauenstein v. Lynham*, 100 U.S. 483, 25 L.Ed. 628 (1879); *De Geofroy v. Riggs*, 133 U.S. 258, 10 S.Ct. 295, 33 L.Ed. 642 (1890)). Even *Asakura v. City of Seattle*, 265 U.S. 332, 44 S.Ct. 515, 68 L.Ed. 1041 (1924), on which defendants rely, upheld the Federal Government's treaty power in matters traditionally relegated to local governments. In *Asakura*, the Court held that a Seattle ordinance, which prohibited the granting of a pawnbroker's license to aliens, violated a treaty between the United States and Japan and was unconstitutional pursuant to the Supremacy Clause[17] of the Constitution.[18]

---

**15.** It is worth noting that two circuits have upheld applications of the Hostage Taking Act to abductions made in connection with alien smuggling. *See Lopez–Flores*, 63 F.3d 1468, 1476 (9th Cir.1995); *United States v. Carrion–Caliz*, 944 F.2d 220 (5th Cir.1991), *cert. denied*, 503 U.S. 965, 112 S.Ct. 1573, 118 L.Ed.2d 217 (1992).

**16.** There are a number of differences between the Act and the Convention, which do not undermine this Court's finding that the Act passes rational basis review. For example, the Act's definition of a "third party" is broader than Article 1 of the Convention.

**17.** "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States,

shall be the supreme Law of the Land...." U.S. Const. art. VI, § 2.

**18.** Tenth Amendment challenges to the Treaty Power, scholars have pointed out, are structurally unsound. In the words of Louis Henkin:

> Since the Treaty Power was delegated to the Federal Government, whatever was within it was not reserved to the States by the Tenth Amendment. Many matters, then, may be 'reserved to the States' as regards domestic legislation but not as regards international agreement. They are, one might say, left to the States subject to defeasance if the United States should decide to make a treaty about them.

L. Henkin, *Foreign Affairs and the Constitution* 146 (1972).

*Equal Protection*

■ The final issue is whether the Hostage Taking Act violates the Equal Protection component of the Fifth Amendment's Due Process Clause. As a preliminary matter, it is necessary to decide first, whether Section 1203 classifies on the basis of alienage, and second, whether the appropriate level of judicial scrutiny should be any other than rational basis.

Section 1203(b) is the jurisdictional provision of the Hostage Taking Act. It delineates the types of hostage-taking offenses that are proscribed under the Act on the basis of several criteria, one of which is the nationality [19] of either the offender or the victim.[20] Thus, for example, unless the United States is the governmental organization sought to be compelled under Section 1203(a), an act of hostage taking that takes place in the United States, involves only nationals of the United States, and where each alleged offender is found in the United States, does not state an offense under the Act. *See* 18 U.S.C.A. § 1203(b)(2) (West Supp.1995). It is clear, therefore, that if any one of the victims or alleged offenders is not a United States national—*i.e.,* is an "alien"—then the jurisdictional elements of Section 1203(b)(2) will be satisfied. Section 1203(b)(2) facially discriminates on the basis of alienage. *See United States v. Lopez–Flores,* 63 F.3d 1468, 1472 (9th Cir.1995).

■ The next step is to decide the level of scrutiny for reviewing the classification. In so doing, the Court recognizes the preeminent role of the United States Government with respect to the regulation of aliens within its borders. The sources of its authority

includ[e] the Federal Government's power "[t]o establish [a] uniform Rule of Naturalization," U.S. Const., Art. I, § 8, cl. 4, its power "[t]o regulate Commerce with for-

eign Nations", *id.,* cl. 3, and its broad authority over foreign affairs, see *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 318 [57 S.Ct. 216, 220, 81 L.Ed. 255] (1936); *Mathews v. Diaz,* [426 U.S. 67, 81 n. 17, 96 S.Ct. 1883, 1892 n. 17, 48 L.Ed.2d 478 (1976)]; *Harisiades v. Shaughnessy,* 342 U.S. 580, 588–589 [72 S.Ct. 512, 518–519, 96 L.Ed. 586] (1952). *Toll v. Moreno,* 458 U.S. 1, 10, 102 S.Ct. 2977, 2982, 73 L.Ed.2d 563 (1982). Indeed, " '[O]ver no conceivable subject is the legislative power of Congress more complete.' " *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) (quoting *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909)); *see also Reno v. Flores,* 507 U.S. 292, 305–06, 113 S.Ct. 1439, 1449, 123 L.Ed.2d 1 (1993).

■ Such power, however, is also subject to constitutional limits, for the Fifth Amendment

protects every [alien] from deprivation of life, liberty, or property without due process of law.... Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.

*Mathews,* 426 U.S. at 77, 96 S.Ct. at 1890 (citing *Wong Yang Sung v. McGrath,* 339 U.S. 33, 48–51, 70 S.Ct. 445, 453–455, 94 L.Ed. 616 (1950); *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896); *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 489, 51 S.Ct. 229, 231, 75 L.Ed. 473 (1931)). In *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), the Supreme Court elaborated on the nature of the Fifth Amendment guarantee with respect to alienage classifications:

The federal sovereign, like the States, must govern impartially. The concept of

---

**19.** The Act adopts the meaning of "national of the United States" pursuant to Section 101(a)(22) of the Immigration and Nationality Act, 8 U.S.C.A. § 1101(a)(22) (1970). *See* Hostage Taking Act, 18 U.S.C.A. § 1203(c) (West Supp.1995). Section 101(a)(22) states, "The term 'national of the United States' means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes

permanent allegiance to the United States." 8 U.S.C.A. § 1101(a)(22) (1970).

**20.** Other criteria include whether (1) the offense occurred outside or inside the United States; (2) the offender is found in the United States; (3) the United States is the "governmental organization" under Section 1203(a). *See* 18 U.S.C.A. § 1203(b) (West Supp.1995).

equal justice under law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment. Although both Amendments require the same type of analysis, see *Buckley v. Valeo,* 424 U.S. 1, 93 [96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976), ... the two protections are not always coextensive. Not only does the language of the two Amendments differ, but more importantly, there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State.

*Id.,* 426 U.S. at 100, 96 S.Ct. at 1903–04 (internal citation omitted).[21]

 Therefore, in the context of a classification based on alienage, the standard of judicial review depends on whether the federal government or a state government authorized it. This "distinction between the constitutional limits on state power and the constitutional grant of power to the Federal Government," *Mathews,* 426 U.S. at 85, 96 S.Ct. at 1894, was at the heart of the *Mathews* decision:

> [I]t is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens.

*Id.* at 84, 96 S.Ct. at 1893. Such judicial deference is warranted, the *Mathews* Court explained, because

> decisions in these matters [regulating the relationship between the United States and aliens within its borders] may implicate our relations with foreign powers, and [because] a wide variety of classifications must be defined in the light of changing political and economic circumstances.

*Id.* at 81, 96 S.Ct. at 1892. *See also Plyler v. Doe,* 457 U.S. 202, 219 n. 19, 102 S.Ct. 2382, 2396 n. 19, 72 L.Ed.2d 786 (1982) ("With respect to the actions of the Federal Government, alienage classifications may be intimately related to the conduct of foreign policy"); *Harisiades v. Shaughnessy,* 342 U.S. at 588–89, 72 S.Ct. at 518–19 (1952) ("any policy towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations").

 Although the standard of review that the Court used in *Mathews* is not readily apparent from the face of the Opinion,[22] the Second Circuit's interpretation of *Mathews* is unambiguous: "the [Supreme] Court has adopted a stance of minimal scrutiny respecting federal regulations that contain alienage-based classifications." *United States v. Duggan,* 743 F.2d 59, 76 (2d Cir.1984). In analyzing a similar Equal Protection challenge to the Hostage Taking Act, the Ninth Circuit recently concluded that rational basis review is appropriate. *See Lopez–Flores,* 63 F.3d at 1474–75 ("Federal legislation that classifies on the basis of alienage, enacted pursuant to Congress' immigration or foreign policy powers, is therefore subject to the lowest level of judicial review."). Under the rational basis standard, the classification need only reasonably further a legitimate state interest to be constitutional.

As stated before, Section 1203(b)(2)'s alienage classification corresponds to Article 13 of the Convention. Under the plain language of the Convention, it follows that when hostage taking "is committed within a single State, the hostage and the alleged offender are nationals of that State and the alleged offender is found in the territory of that State," Convention, art. 13, then such an offense is not one "of grave concern to the international

---

**21.** The equal protection component of both clauses converges, however, "when a federal rule is applicable to only a limited territory, such as the District of Columbia, or an insular possession, and when there is no special interest involved." *Id.* (citing *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Yu Cong Eng v. Trinidad,* 271 U.S. 500, 46 S.Ct. 619, 70 L.Ed. 1059 (1926)).

**22.** *See Mathews,* 426 U.S. at 82–83, 96 S.Ct. at 1892–93 ("It is unquestionably reasonable for

Congress to make an alien's eligibility [to participate in the federal medical insurance program] depend on both the character and the duration of his residence.... [N]either requirement is wholly irrational...."). In *Nyquist v. Mauclet,* 432 U.S. 1, 7 n. 8, 97 S.Ct. 2120, 2124 n. 8, 53 L.Ed.2d 63 (1977), Justice Blackmun explained that the *Mathews* Court applied "relaxed scrutiny" in upholding the federal statute at issue in that case. *Id.*

community," *id.,* Preamble. Therefore, the alienage classification does not violate equal protection, because it reasonably furthers the legitimate—if not compelling—foreign policy interest behind the Hostage Taking Act: "to attack the pressing and urgent problem of international terrorism." Message from the President, *ante,* at 1.

### SECTION 924(c)

█ Defendants also challenge the constitutionality of 18 U.S.C.A. § 924(c) (West Supp.1995),[23] arguing that in light of the Supreme Court's decision in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Section 924(c) lies beyond Congress' Commerce Clause power.[24] In *Lopez,* the Supreme Court struck down the Gun–Free School Zones Act of 1990, 18 U.S.C.A. § 922(q)(1)(A) (West Supp.1995), as an unconstitutional exercise of Congress' authority under the Commerce Clause. The Court set forth three categories of conduct that the Federal Government may regulate under the Commerce Clause:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons and things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those ac-

tivities that substantially affect interstate commerce.

*Lopez,* —— U.S. at —— – ——, 115 S.Ct. at 1629–30 (citations omitted).

As defendants correctly point out, Section 924(c) "sets out an offense distinct from the underlying felony and is not simply a penalty provision," S.Rep. No. 225, 98th Cong., 1st Sess., *reprinted in* 1984 U.S.C.C.A.N. 3182, 3490–92. However, an extension of the *Lopez* holding to Section 924(c) is unwarranted. Section 924(c) requires the existence of a predicate federal offense, in this instance, a violation of the Hostage Taking Act. Therefore, Section 924(c) contains a "jurisdictional element which would ensure, through case-by-case inquiry, that the [violation] in question," *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631, is subject to Congress' legislative powers.[25] Since the Act is a constitutional exercise of Congress' power under the Necessary and Proper Clause, *ante,* the jurisdictional prerequisite of Section 924(c) is satisfied.

### CONCLUSION

For the reasons set forth above, defendants' motion to dismiss Counts Three, Four, Five, and Six of the Superseding Indictment is denied.

### SO ORDERED:

### APPENDIX

The Convention, in relevant part, provides:

---

**23.** Section 924(c)(1) provides in relevant part: "Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years...." 18 U.S.C.A. § 924(c)(1) (West Supp.1995).

**24.** This kind of challenge to Section 924(c) is not one of first impression in this Circuit. *See United States v. Torres,* 1995 WL 459247 (S.D.N.Y. Aug. 2, 1995) (Section 924(c), as applied to defendants charged with violations of RICO, 18 U.S.C. §§ 1962(a), 1962(c), robbery, and conspiracy to commit robbery, does not exceed Congress' Commerce Clause power).

**25.** It is worth noting that the Fifth Circuit's decision which the Supreme Court affirmed distin-

guished Section 924(c) from the constitutionally infirm Section 922(q)(1)(A):

> We lay to one side, as irrelevant to our inquiry, diverse federal legislation enhancing the penalty for use or possession of a firearm in the commission of some *other federal offense.* The jurisdictional basis of such legislation is obviously that applicable to the underlying federal offense, and the legislation is properly seen as a regulation of the latter. The same reasoning applies even where, as in the case of 18 U.S.C. § 924(c), the firearms provision is treated as a separate offense ... as its jurisdictional basis is still that of the other federal offense.

*United States v. Lopez,* 2 F.3d 1342, 1348 n. 10 (5th Cir.1993). *See also United States v. Grafton,* 1995 WL 506001, at *4 (N.D.Ga. Aug. 15, 1995) (holding Section 924(c) is constitutional when underlying offense also lies within Congress' Commerce Clause power).

## Article 1

1. Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of this Convention....

. . . . .

## Article 5

1. Each State Party shall take such measures as may be necessary to establish its jurisdiction over any of the offences set forth in article 1 which are committed:

(a) in its territory ...;

(b) by any of its nationals ...;

(c) in order to compel that State to do or abstain from doing any act; or

(d) with respect to a hostage who is a national of that State, if that State considers it appropriate.

. . . . .

## Article 13

This Convention shall not apply where the offence is committed within a single State, the hostage and the alleged offender are nationals of that State and the alleged offender is found in the territory of that State.