UNITED STATES of America

v.

NI FA YI, Ni Zhou Neng, a/k/a "Ah Di," Jiang Tong Deng, Dong Ji Rong, Lin Wan Gui, Liu Xiang, and Jiang Dian Xiu, Defendants.

No. 96 Cr. 558 (SS).

United States District Court, S.D. New York.

Jan. 7, 1997.

Thomas H. Nooter, Theodore Cox, New York City, for Defendant Ni Fa Yi.

Edward D. Wilford, New York City, for Defendant Liu Xiang.

U.S. Department of Justice, United States Attorney Southern District of New York, New York City, Joseph F. Bianco, Assistant United States Attorney, for U.S.

## *OPINION AND ORDER*

SOTOMAYOR, District Judge.

Defendant, Ni Fa Yi, is charged with hostage taking in violation of 18 U.S.C. § 1203. He allegedly participated in a scheme pursuant to which several Chinese citizens were smuggled into this country and held captive until relatives living in the United States paid ransom to secure their release. Defendant moves to dismiss the claim against him on the grounds that the Hostage Taking Act denies him Equal Protection under the law, and that it was passed in violation of the Tenth Amendment of the United States Constitution.[1] For the reasons to be discussed, defendant's motion is denied.

## DISCUSSION

### I. *Equal Protection*

■ Defendant charges that the Hostage Taking Act deprives him of equal protection under the Fifth Amendment of the United States Constitution by impermissibly classifying offenders and victims on the basis of alienage. In relevant part, the Act provides:

> (a) [W]hoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to com-

pel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained ... shall be punished by imprisonment for any term of years or for life ...

\* \* \* \* \* \*

> (b)(2) It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the government of the United States.

18 U.S.C. § 1203. As a threshold requirement to advancing his Equal Protection claim, defendant must demonstrate that this provision, "either on its face or as applied, results in members of a certain group being treated differently from other persons based on membership in that group." *United States v. Pacheco*, 902 F.Supp. 469, 471 (S.D.N.Y.1995). "[I]f it is demonstrated that a cognizable class is treated differently, the court must analyze under the appropriate level of scrutiny whether the distinction made between the groups is justified."[2] *United States v. Lopez–Flores*, 63 F.3d 1468, 1472 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 794, 133 L.Ed.2d 743 (1996), *and cert. denied,* —— U.S. ——, 116 S.Ct. 795, —— L.Ed.2d —— (1996).

As recognized by all four courts to have considered this issue, the Hostage Taking Act "facially discriminates on the basis of

---

1. During oral argument in this matter, defendant Liu Xiang joined in defendant Ni Fa Yi's motion. (Tr. of Dec. 16, 1995 oral argument at 16). The Court's determination herein binds both defendants.

2. Defendant proposes that the Court conduct a hearing "to establish, with statistical evidence, how this statute is actually applied." Motion at 11. Such a hearing is unnecessary for two reasons. First, because the Court finds that the Act facially differentiates between aliens and citizens, the Act must be scrutinized under Equal Protection, and no further showing of a differential impact between these two groups is required.

*Pacheco*, 902 F.Supp. at 471. Second, to the extent that defendant suggests that a hearing would demonstrate a racial disparity in the number of prosecutions under the Act, as opposed merely to a disparity reflecting alienage, he has not proffered any basis for supposing that Congress passed the Act with any improper race based discriminatory purpose. In the absence of a such a showing, the Act would not be subject to the strict scrutiny applicable to racial classifications, but would remain subject to the rational basis analysis applied herein. *See Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292–93, 60 L.Ed.2d 870 (1979).

alienage." *United States v. Yian,* 905 F.Supp. 160, 166 (S.D.N.Y.1995); *see also Lopez,* 63 F.3d at 1472 (addressing whether the Act treats persons differently on the basis of alienage; "This appellants have established."); *Pacheco,* 902 F.Supp. at 471 ("Here, the Act treats aliens differently from United States citizens, as, in certain circumstances, particular conduct is criminal only if the perpetrator is an alien."); *United States v. Song,* 1995 WL 736872, at *2 (S.D.N.Y. 1995) ("[T]he Act is not facially neutral."). As explained by the Court in *Lopez:*

> If either the alleged offender or the victim is a non-national, the Hostage Taking Act applies; however, if both the alleged offender and the victim(s) are nationals of the United States (and the offense occurred in the United States and each alleged offender is found in the United States) then the Act is inapplicable, unless the alleged offender sought to compel the government of the United States to do or abstain from any act.

63 F.3d at 1471–72. Because the Act is not facially neutral, this Court must determine "(1) the appropriate level of scrutiny and (2) whether the statute is proper under this level of scrutiny." *Pacheco,* 902 F.Supp. at 471.

■ All of the courts to have considered Equal Protection challenges to the Hostage Taking Act have concluded that the Act is constitutional so long as its alienage classification "rationally further[s] a legitimate state interest." *Song,* 1995 WL 736872, at *3; *see also Lopez,* 63 F.3d at 1473; *Yian,* 905 F.Supp. at 167; *Pacheco,* 902 F.Supp. at 471. Though recognizing that the weight of authority is against him, defendant resists the application of rational basis scrutiny in this matter, arguing instead that alienage is a suspect classification that must be strictly scrutinized by reviewing courts. As the Government points out, however, strict scrutiny has been applied to classifications based on alienage only where state laws have been at issue. *See, e.g., Bernal v. Fainter,* 467 U.S.

216, 219, 104 S.Ct. 2312, 2315–16, 81 L.Ed.2d 175 (1984) (holding that a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (striking down state restrictions on welfare benefits based upon an alienage classification).

■ "Federal interests regarding aliens are significantly different than those of the states; immigration and foreign relations are paramount federal concerns." *Lopez,* 63 F.3d at 1473; *see also Yian,* 905 F.Supp. at 166 (describing the federal government's unique role "with respect to the regulation of aliens within its borders."). As further explained by the Court in *Pacheco:*

> "it is appropriate for Congress to regulate the conduct of aliens in ways that it cannot regulate the conduct of citizens because the conduct of aliens implicates foreign policy issues. Moreover, 'since a wide variety of classifications must be defined in light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.'

*Pacheco,* 902 F.Supp. at 472 (quoting *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976)). Thus, "[a]lthough state laws that classify persons based on alienage are subject to strict scrutiny, federal laws that classify on the basis of alienage are subject only to rational basis analysis because of the immigration and foreign policy concerns inherent in the relationship between the federal government and aliens." [3] *See Song,* 1995 WL 736872, at *3 (citations embodied); *see also Duggan,* 743 F.2d at 76. As noted, rational basis review requires only that the Act rationally relates to a legitimate governmental purpose.

"Strong foreign policy concerns arising from the increased threat of in-country ter-

---

**3.** Defendant makes the interesting argument that even if rational basis review properly applies to most federal enactments including alienage classifications, it should not apply where "core values" are implicated. However, the Supreme Court has never suggested such an approach,

and the Second Circuit has essentially foreclosed it. *See United States v. Duggan,* 743 F.2d 59, 75 (2d Cir.1984) (holding generally that "minimal scrutiny" applies to "federal regulations that contain alienage-based classifications.").

rorist attacks and the desire to meet the United States' obligations under international treaties provided the impetus for passage of the Hostage Taking Act." *Lopez*, 63 F.3d at 1473. In 1979, the United States became a signatory, along with 45 other nations, to the International Convention Against the Taking of Hostages, U.N. GAOR, Supp. No. 39, at 23, U.N. Doc. A/34/39 (1979). A subsequent rash of terrorist activity prompted President Ronald Reagan to introduce a legislative package that would "send a strong and vigorous message to friend and foe alike that the United States will not tolerate terrorist activity against its citizens within its borders." *See Lopez*, 63 F.3d at 1472. This proposed legislation ultimately developed into the Act, which was intended to reach "incidents of hostage taking associated with international or political terrorism." *See Yian*, 905 F.Supp. at 164.

 "[T]he provision containing the alienage-based classification in the Act mimics language contained in the Hostage Taking Convention." [4] *Pacheco*, 902 F.Supp. at 472. The government argues that this is dispositive, that the Act satisfies the requirements of Equal Protection because it is reasonably drafted to effectuate the United States' treaty obligations. The Court agrees with defendant, however, that this begs the question: "[N]o agreement with a foreign nation can confer power on the Congress, or on any branch of Government, which is free from the constraints of the Constitution." *Reid v. Covert*, 354 U.S. 1, 16, 77 S.Ct. 1222, 1230, 1 L.Ed.2d 1148 (1957); *see also Boos v. Barry*, 485 U.S. 312, 324, 108 S.Ct. 1157, 1165, 99 L.Ed.2d 333 (1988) ("[R]ules of international law and provisions of international agreements of the United States are subject to the Bill of Rights and other prohibitions, restrictions and requirements of the Constitution and cannot be given effect in violation of them."). Therefore, it is not enough to conclude simply that the Act effectuates the terms of an international treaty; the Act can be upheld only upon the further determination that it reasonably serves legitimate governmental ends.[5]

The ostensible purpose for the Act—combating international terrorism—is undoubtedly a legitimate federal governmental end. It is a cause for genuine concern, however, that the Act reaches a significant amount of conduct unrelated to this appropriate aim. "There are acts of kidnapping that would technically fit under the Hostage Taking Act but which do not have the slightest connection with international terrorism." *Song*, 1995 WL 736872, at *5 (citing the example of an "intrafamilial kidnaping" in which "the perpetrator or the victim"—though living in this country for many years—"happened never to have applied for citizenship"). Despite this failure of fit between the Act and its legitimate end, I find that the alienage classification is supported by at least a sufficient rational basis to satisfy the applicable deferential standard of review.

"[I]n drafting the Act as broadly as it did, Congress necessarily determined that any crime involving aliens is sufficiently 'international' in nature to fall within the auspices of its power to legislate in the areas of foreign relations and immigration." *Pacheco*, 902 F.Supp. at 473. Moreover, application of the Act even in those instances most attenuated from any valid international concerns at least "serves the general principle of deterrence and thus furthers Congress's goal of controlling terrorism and hostage taking. By applying the Act strictly, non-United States nationals will be put on notice that they will be prosecuted in federal court if they cross our borders and engage in acts of kidnapping." *Id.* The allegations at issue in this matter reveal an additional legitimate end reasonably served by the provisions of the Act. Defendant, an alien, is being prosecuted for extortion in connection with the smuggling of illegal aliens into the United

---

**4.** Article 13 provides that "[t]his convention shall not apply where the offense is committed within a single state, the hostage and the alleged offender are nationals of the State and the alleged offender is found in the territory of that State." Hostage Taking Convention, art. XIII, T.I.A.S. No. 11081.

**5.** Curiously, the Court in *Song* recognized this proposition, but proceeded to uphold the Act for the sole reason that it was tailored to satisfy the United States' obligations under the Convention. *Song*, 1995 WL 736872, at *4.

States—a scenario which necessarily depends upon the alienage of the persons involved, and which undoubtedly is of legitimate concern to Congress. In light of these considerations, the Court must accept that the alienage classification included in the Act is at least rationally related to the government's legitimate interests in combating and deterring criminal acts implicating international and immigration concerns.

It is unfortunate that the federal government, through its treaty power and in subsequent legislation, saw fit to criminalize conduct specifically on the basis of the alienage of the persons involved. It troubles this Court to contemplate that its holding today might come to be relied upon as authority in support of some other provision or regime which, at bottom, effects no sounder purpose than to discriminate against persons on the basis of their alienage. Nevertheless, this does not appear to be the motivation behind the Hostage Taking Act. In light of the deference afforded the federal government in connection with legislation passed pursuant to its immigration and foreign policy powers, the Act must therefore be upheld as constitutional.

## II. *The Tenth Amendment*

■ Though defendant invokes the Tenth Amendment in support of his Motion to Dismiss, his briefing is focused almost exclusively upon his claims under the Equal Protection Clause. Defendant's Tenth Amendment claim rests upon his general assertion that, by reaching a broad range of kidnapping not directly related to any national or international concerns, Congress has intruded into an area properly reserved to the police powers of the states. However, as already discussed, the Act was narrowly tailored to implement the terms of the International Convention. Congress thereby acted within its power, as specifically authorized under the Constitution, to enact such legislation as is "necessary and proper" to implement treaties. U.S. Const. art. I, § 8, cl. 18. Therefore, as held by the Courts in *Yian* and *Song,* the Tenth Amendment provides no basis for rejecting the Act as unconstitutional. *See Yian,* 905 F.Supp. at 165; *Song,* 1995 WL

736872, at *4 ("The need to comply with the Treaty while not at the same time violating the Tenth Amendment does, in this case, constitute a legitimate governmental purpose for the use of classification.").

## CONCLUSION

For the reasons set forth above, the Court denies defendant's Motion to Dismiss, and rejects his claim that 18 U.S.C. § 1203 was passed in violation of the Equal Protection clause and the Tenth Amendment of the United States Constitution.

**SO ORDERED.**